**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CONTINENTAL PAPER GRADING CO., | |
| Plaintiff, | |
| v. | Civil Action No. 1:21-cv-224 |
| NATIONAL RAILROAD PASSENGER, CORPORATION—AMTRAK, | |
| Defendant. | |

**NATIONAL RAILROAD PASSENGER CORPORATION'S**
**ANSWER AND AFFIRMATIVE DEFENSES TO**
**COMPLAINT OF CONTINENTAL PAPER GRADING CO.**

Defendant, the National Railroad Passenger Corporation ("Amtrak"), by and through its

counsel, and for its Answer and Affirmative Defenses to the Complaint of Plaintiff, Continental

Paper Grading Company ("Continental Paper" or "Plaintiff"), states that all allegations not

specifically admitted in the Complaint are denied and further states:

**NATURE AND SUMMARY OF THE ACTION**

1.      For over four decades, since 1976, Amtrak has owned and operated a train servicing
facility consisting of approximately fifty acres located at 1500-1700 South Lumber Street,
Chicago, Cook County, Illinois 60616 (the "Amtrak Facility"). During Amtrak's ownership and
operation of the Amtrak Facility, a multitude of spills, tank leaks, and other releases of hazardous
substances have occurred on, under and from the Amtrak Facility. These releases have resulted in
environmental contamination of soil, surface water and groundwater not only onsite at the Amtrak
Facility, but also offsite, in both the nearby South Branch of the Chicago River, and on and under
the approximately 1.2-acre neighboring property owned by Continental Paper, located at 1623
Lumber Street in Chicago, Illinois (the "CPG Facility"). The CPG Facility is situated
immediately adjacent to and downgradient from the Amtrak Facility, and is surrounded on three
sides by the Amtrak Facility.

**ANSWER**:      Amtrak admits that it has owned and operated the facility consisting of

approximately fifty acres located at 1500-1700 South Lumber Street, Chicago, Cook County,

Illinois 60616 (the "Amtrak Facility") since approximately 1976 and that the property owned by

Continental Paper, located at 1623 Lumber Street in Chicago, Illinois (the "CPG Facility") is

situated immediately adjacent to the Amtrak Facility and is surrounded on three sides by the

Amtrak Facility. Amtrak denies the remaining allegations in Paragraph 1.

       2.     As recently as January 2019, spills and releases of hazardous substances and
diesel fuel have occurred at and from the Amtrak Facility, resulting in environmental
contamination of the CPG Facility. In this regard, at approximately 2:00 a.m. on January 6, 2019,
an Amtrak mobile tanker truck was being filled with diesel fuel from a 450,000-gallon above-
ground diesel fuel storage tank located on the Amtrak Facility. The truck driver failed to
disconnect the fuel-loading hose from the truck before leaving the fuel loading area. As the
tanker truck departed the loading area, the still-attached hose damaged the truck and caused the
release of approximately 2,800 gallons of diesel fuel from the truck. Diesel fuel flowed from the
loading area onto and along Lumber Street, and continued to spill from the truck as the driver
stopped and parked the truck at the southwest corner of Continental Paper's building at the CPG
Facility. From there, diesel fuel continued to spill into the parking lot at the CPG Facility and
flowed eastward toward the Chicago River.

      **ANSWER**:    Amtrak admits that on January 6, 2019, Amtrak had an accidental release

of diesel fuel at the Amtrak Facility during mobile fueling tanker filling operations when the

driver of a tanker truck failed to disconnect the fuel loading hose from the truck before leaving

the loading rack area after filling the mobile tanker truck with fuel.  Responding further, Amtrak

admits that as the truck proceeded to pull away from the loading rack heading north on South

Lumber Street, the attached hose damaged the mobile tanker truck resulting in a release of diesel

fuel from the tank compartment of the vehicle, which flowed onto and along the east side of

Lumber Street pavement from the loading rack and continued until the driver stopped and parked

the tanker truck in front of and adjacent to a rail spur adjacent to the Continental Paper building

located at 1623 S. Lumber Street. Amtrak admits that approximately 2,800 gallons of diesel fuel

was released, and that diesel fuel flowed onto the Continental Paper parking lot and toward the

eastern property boundary. Amtrak denies the remaining allegations in Paragraph 2.

3.      According to reports prepared by Amtrak's environmental consultants, while this January 2019 spill released approximately 2,800 gallons of diesel fuel, only 900 gallons -- less than one-third of the spilled fuel -- was recovered.

**ANSWER**:      Amtrak denies the allegations in Paragraph 3.

4.      After the January 2019 spill at the Amtrak Facility, free petroleum product was detected in, and collected from, a monitoring well on the CPG Facility. This free petroleum product sample was determined to contain low-sulfur off-road diesel fuel. High levels of naphthalene at the CPG Facility have also been reported in soils, at concentrations that may exceed Illinois EPA soil standards, both before and after Amtrak's January 2019 spill.

**ANSWER**:      Amtrak is without sufficient knowledge or information regarding the

allegations of Paragraph 4, and therefore denies same.

5.      Analyses performed on behalf of Continental Paper in February 2020 of one solid sample and one aqueous phase liquid sample collected from a monitoring well on the CPG Facility likewise indicated that these samples have the characteristics of diesel fuel.

**ANSWER**:      Amtrak is without sufficient knowledge or information regarding the

allegations of Paragraph 5, and therefore denies same.

6.      Prior to the January 2019 spill, Amtrak's protracted history of documented releases of petroleum and hazardous substances from the Amtrak Facility on, into and under onsite and offsite soils, surface water and groundwater -- and ultimately, into the Chicago River -- dates back to the 1970s.

**ANSWER**:      Amtrak denies the allegations in Paragraph 6.

7.      A multitude of spills, tank leaks, and other releases of hazardous substances have occurred on, under and from the Amtrak Facility during Amtrak's forty-three (43) years of operating there, and these releases have migrated onto the CPG Facility and contaminated the soils, surface water and groundwater at the CPG Facility. Despite this, Amtrak has failed and/or refused to undertake any assessment or investigation of its contamination of the CPG Facility, and has failed and/or refused to remediate its contamination of the CPG Facility. In addition, Amtrak has arbitrarily shut down remediation systems operated to address contamination at the Amtrak Facility, such as its multi-phase extraction system ("MPE System") and its active skimming and recovery recapture system for a groundwater contaminant known as non-aqueous phase liquid ("NAPL"), without regard for the impact that such shutdowns have had on causing, allowing and/or exacerbating contamination of the CPG Facility.

**ANSWER**:      Amtrak denies the allegations in Paragraph 7.

8.      Given Amtrak's chronic failure and/or refusal to assess or address its contamination of the CPG Facility, Continental Paper has incurred costs to engage consultants to

(a) evaluate conditions at the CPG Facility, (b) review the investigation and remediation work being performed by Amtrak onsite at the Amtrak Facility, and (c) assess the incomplete remediation work performed by Amtrak at the CPG Facility in the wake of the January 2019 diesel fuel spill. Continental Paper has also suffered the material diminution in the value of the CPG Facility as a result of releases of diesel fuel and/or hazardous substances at and from the Amtrak Facility.

**ANSWER**: Amtrak is without sufficient knowledge or information regarding the

allegations of Continental Paper's costs and diminution in value of the CPG Facility, and

therefore denies same. Amtrak denies the remaining allegations in Paragraph 8.

9. Continental Paper brings this civil action against Amtrak to recover response costs incurred by Continental Paper pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*; to secure contribution from Amtrak; to obtain declaratory relief pursuant to CERCLA and the Federal Declaratory Judgments Act, 28 U.S.C. § 2201, holding Amtrak liable for all future response costs that Continental Paper will incur in addressing releases, threatened releases and/or migration of hazardous substances on, under and from the Amtrak Facility that impact the CPG Facility; to recover damages pursuant to Illinois common law for diminution in the value of the CPG Facility as a result of contamination caused by Amtrak, and to assess exemplary and punitive damages against Amtrak. In addition, Continental Paper seeks injunctive relief requiring Amtrak to promptly and fully assess and remediate the existing hazardous conditions and contamination that Amtrak has caused at the CPG Facility.

**ANSWER**: Amtrak denies that Continental Paper is entitled to the relief it is seeking

in this Complaint, and as specifically stated in Paragraph 9.

## THE PARTIES

10. Continental Paper is an experienced waste paper broker founded in 1919, specializing in waste paper management, post-industrial and post-consumer plastics, recyclable metals, and more. Continental Paper is an Illinois corporation with a principal place of business located at 7250a Santa Fe Drive, Hodgkins, Illinois 60525.

**ANSWER**: Amtrak is without sufficient knowledge or information regarding the

allegations of Paragraph 10, and therefore denies same.

11. Upon information and belief, Amtrak is a District of Columbia corporation with a principal office and place of business at 1 Massachusetts Avenue NW, Washington, D.C. 20001.

**ANSWER**: Amtrak admits the allegations in Paragraph 11.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to CERCLA, 42 U.S.C. §§ 9607 and 9613; based on the existence of a federal question, 28 U.S.C. § 1331; and based on diversity of citizenship between the parties, where the amount in controversy exceeds $75,000.00 exclusive of interest and costs, 28 U.S.C. § 1332. To the extent that jurisdiction is premised on the existence of a federal question, the Court has supplemental jurisdiction over Illinois state law claims based on 28 U.S.C. § 1367, in that they are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

**ANSWER**:     The allegations contained in Paragraph 12 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same.

13.     Venue is appropriate in the Northern District of Illinois pursuant to 42 U.S.C. § 9613(b), 42 U.S.C. § 6972(a)(1)(B), and pursuant to 28 U.S.C. 1391(b), because the releases or threatened releases of hazardous substances, acts or omissions on the part of Amtrak, and/or damages incurred and to be incurred by Continental Paper giving rise to this action have each occurred and will occur in this judicial district, and because the offending Amtrak Facility and the impacted CPG Facility are both situated within the Northern District of Illinois.

**ANSWER**:     The allegations contained in Paragraph 13 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same.

## FACTUAL BACKGROUND
### History of Spills and Releases of Contamination at the Amtrak Facility

14.     The Amtrak Facility consists of approximately fifty (50) acres situated one mile south of downtown Chicago, bounded by the Metra commuter rail yard to the west, Roosevelt Road to the north, the CPG Facility and the Chicago River to the east, and 18th Street to the south.

**ANSWER**:     Amtrak admits the allegations in Paragraph 14.

15.     Upon information and belief, the Amtrak Facility has been in use as a train servicing facility for approximately one-hundred (100) years, and has been owned and operated by Amtrak since 1976.

**ANSWER**:     Amtrak admits the allegations in Paragraph 15.

16.     Upon information and belief, gasoline, diesel fuels and/or hazardous substances were stored in above-ground storage tanks ("ASTs"), underground storage tanks ("USTs"), and underground pipelines at the Amtrak Facility as of 1976, when Amtrak began to operate the Amtrak Facility.

**ANSWER**: Amtrak admits that fuel oil and other materials were stored in above ground storage tanks and underground storage tanks at the Amtrak Facility when Amtrak acquired the Amtrak Facility in 1976. Amtrak denies the remaining allegations in Paragraph 16.

17. The January 2019 spill and release of hazardous substances from Amtrak's operations at the Amtrak Facility was preceded by a long history of spills, releases of hazardous substances and contamination of environment due to Amtrak's operation of the Amtrak Facility.

**ANSWER**: Amtrak denies the allegations in Paragraph 17.

18. Upon information and belief, in 1978, Illinois EPA conducted a site inspection at the Amtrak Facility following a report of the release of over 97,000 gallons of diesel fuel from a 980,000-gallon AST, after which 10,000 gallons of diesel fuel were not accounted for. Petroleum contamination from the release was visible in the form of a sheen on the Chicago River at the time of the Illinois EPA site inspection.

**ANSWER**: Amtrak admits that in 1978, an AST at the Amtrak Facility was leaking fuel oil, and Amtrak discontinued the use of both of the ASTs at the Amtrak Facility. Responding further, Amtrak states that the southern AST was never returned to service and the northern AST was relined with 30-mil internal coating before being returned to service. Amtrak is without sufficient knowledge or information regarding the remaining allegations in Paragraph 18, and therefore denies same.

19. Upon information and belief, in or about October and November 1992, petroleum and hazardous substances at the Amtrak Facility were escaping from the Amtrak Facility and contaminating the Chicago River. Indeed, in November 1992, Amtrak was cited by the City of Chicago for petroleum releases from the Amtrak Facility into the Chicago River.

**ANSWER**: Amtrak admits that it received a citation from the City of Chicago for alleged contamination to the Chicago River in November 1992. Amtrak denies the remaining allegations in Paragraph 19.

20. In August 1994, Amtrak enrolled the Amtrak Facility in Illinois EPA's Site Remediation Program ("SRP"), a voluntary program for investigating and cleaning up environmental contamination existing on one's property. Amtrak made no effort under this program to address the environmental contamination at the CPG Facility caused by Amtrak's operations and activities.

**ANSWER**:    Amtrak admits that it voluntarily enrolled a portion of the Amtrak Facility

in the Illinois Prenotice Program in 1994. Amtrak denies the remaining allegations in Paragraph

20.

21.    Upon information and belief, in 1996, Amtrak submitted a report in connection
with its SRP obligations that revealed that a layer of NAPL contamination existed beneath the
Amtrak Facility; heavy soil contamination existed to the west of Amtrak's 980,000 gallon AST;
and Amtrak's 980,000-gallon AST and 10,000-gallon UST and/or associated pipelines were
principal sources of contamination at the Amtrak Facility.

**ANSWER**:    Amtrak admits that it submitted a Report of Soil and Groundwater

Sampling to the Illinois EPA in 1996, which identified various areas of subsurface

contamination, including some areas with free product present.  Amtrak denies the remaining

allegations in Paragraph 21.

22.    Upon information and belief, between 1997 and 2002, periodic measurements of
the NAPL performed by or on behalf of Amtrak demonstrated that this contamination continued
to exist beneath the Amtrak Facility.

**ANSWER**:    Amtrak admits that it conducted groundwater sampling at the Amtrak

Facility at various locations and at various times between 1997 and 2002, and that some of those

samples contained measurable free product.  Amtrak denies the remaining allegations in

Paragraph 22.

23.    Upon information and belief, between 1997 and 2002, the results of groundwater
sampling performed by or on behalf of Amtrak demonstrated exceedances of applicable
groundwater standards for polynuclear aromatic hydrocarbons ("PAHs"), lead and barium at the
Amtrak Facility.

**ANSWER**:    Amtrak admits that it conducted groundwater sampling at the Amtrak

Facility at various locations and at various times between 1997 and 2002, and that some of those

samples contained various levels of polynuclear aromatic hydrocarbons ("PAHs"), lead and

barium.  Amtrak denies the remaining allegations in Paragraph 22.

24.    Upon information and belief, between 2002 and 2004, Amtrak reported a series of
oil slicks on the Chicago River adjacent to the Amtrak Facility. For instance, in June 2002,

Amtrak reported a 100 foot by 15 foot (length x width) oil slick on the Chicago River; in July 2002, Amtrak reported a 20 foot by 4 foot (length x width) oil slick on the Chicago River; and in July 2004, Amtrak reported a third oil slick on the Chicago River. In conjunction with this third report, Amtrak acknowledged that these oil slicks and sheens on the Chicago River originated from contaminated groundwater migrating from the Amtrak Facility.

**ANSWER**:    Amtrak admits that it has observed and reported a sheen on the Chicago

River on a number of occasions between 2002 and 2004. Amtrak denies the remaining

allegations in Paragraph 24.

25.    Upon information and belief, in January 2005, Illinois EPA conducted an inspection at the Amtrak Facility and observed an oily sheen on the Chicago River, and also observed that releases of oil through the Amtrak Facility's sheet piling along the Chicago River were visible.

**ANSWER**:    Amtrak admits that Illinois EPA conducted a site visit in January 2005,

and observed oily sheen on the Chicago River. Amtrak denies the remaining allegations in this

Paragraph 25.

### Amtrak's Attempts to Address Releases of Contamination – at the Amtrak Facility Only

26.    On or about March 7, 2006, the State of Illinois filed action against Amtrak in the Circuit Court for Cook County, for violations of Illinois environmental laws and regulations arising from contamination of groundwater and of the Chicago River by releases of diesel fuel and hazardous substances occurring during Amtrak's ownership and operation of the Amtrak Facility. On or about April 28, 2006, Amtrak removed the action to the U.S. District Court for the Northern District of Illinois, Eastern Division (Case No. 06-CV-2385).

**ANSWER**:    Amtrak admits that the State of Illinois filed an action against Amtrak on

or about March 7, 2006, which Amtrak removed to the U.S. District Court for the Northern

District of Illinois, Eastern Division (Case No. 06-CV-2385). To the extent the allegation in

Paragraph 26 are allegations of the State of Illinois's complaint, no answer is required. To the

extent an answer is required, Amtrak admits the State of Illinois complaint alleged violations of

environmental laws arising from contamination of groundwater and of the Chicago River by

releases of diesel fuel at the Amtrak Facility.

27.     On or about November 27, 2006, Amtrak entered into an Agreed Interim Order with the State of Illinois obligating Amtrak to undertake various interim remedial measures and remedial investigation activities to address releases of contaminants into the Chicago River from the Amtrak Facility.

**ANSWER**:     Amtrak admits the allegations in Paragraph 27.

28.     Thereafter, on or about August 4, 2009, Amtrak entered into a Consent Order with the State of Illinois obligating Amtrak, among other things, to continue to implement various remedial measures to address ongoing releases of contamination at and from the Amtrak Facility; requiring Amtrak to pay a civil penalty of $113,000; obligating Amtrak to prepare, submit and implement a comprehensive remedial action plan for the Amtrak Facility; and requiring Amtrak to cease and desist from committing future violations of Illinois environmental statutes and regulations in its operation of the Amtrak Facility.

**ANSWER**:     Amtrak admits the allegations in Paragraph 28.

29.     In late 2008 and 2009, Amtrak prepared and submitted to Illinois EPA a Remedial Objectives Report ("ROR") and one or more revised versions of same based on Illinois EPA comments, including a revised ROR dated November 2, 2009 prepared by AMEC Earth & Environmental, Inc. on behalf of Amtrak (the "2009 AMEC Revised ROR").

**ANSWER**:     Amtrak admits that it prepared and submitted to Illinois EPA a Remedial

Objectives Report ("ROR") and one or more revised versions of the ROR, including a Revised

ROR dated November 23, 2009. Amtrak denies the remaining allegations in Paragraph 29.

30.     The 2009 AMEC Revised ROR identified various Areas of Concern ("AOCs") at the Amtrak Facility contaminated by various CERCLA-listed hazardous substances, including, but not limited to, naphthalene in soils.

**ANSWER**:     Amtrak admits that the AMEC Revised ROR identifies eight AOCs at the

Amtrak Facility contaminated with various constituents of concern. Amtrak denies the remaining

allegations in Paragraph 30.

31.     Additionally, the 2009 AMEC Revised ROR confirmed the existence of a plume of free product comprised of petroleum originating from the Amtrak Facility and impacting the CPG Facility.

**ANSWER**:     Amtrak admits that the 2009 AMEC Revised ROR identified free-phase

product consisting of No. 2 (diesel fuel) at the Amtrak Facility. Amtrak denies the remaining

allegations in paragraph 31.

32.     Notwithstanding this confirmation of contamination extending beyond the boundaries of the Amtrak Facility and impacting the CPG Facility, Amtrak failed and/or refused to undertake -- or even propose -- any investigation or remediation activities to assess or address these impacts to the CPG Facility.

**ANSWER**:     Amtrak denies the allegations in Paragraph 32.

33.     Upon information and belief, in early 2016, a 4,000-gallon UST was discovered at the Amtrak Facility. Liquids, including oil, were discovered inside the UST, and cracks and fissures were observed along the inside the UST wall during inspection of the tank. Amtrak reported a release from this UST to the Illinois Emergency Management Agency ("Illinois EMA").

**ANSWER**:     Amtrak admits that a UST was discovered at the Amtrak Facility in 2016

and a release from that UST was properly reported to the Illinois Emergency Management

Agency. Amtrak denies the remaining allegations in Paragraph 33.

34.     Between 2009 and 2017, Amtrak's remediation efforts onsite at the Amtrak Facility included intermittent operation of the MPE System, designed to recover light NAPL from monitoring and recovery wells on the Amtrak Facility.

**ANSWER**:     Amtrak admits that it operated a multi-phase extraction ("MPE") system

as part of its remediation efforts to recover liquid phase hydrocarbons from the subsurface at the

Amtrak Facility.  Amtrak denies the remaining allegations in Paragraph 34.

35.     The MPE System was not in operation or was voluntarily shut down by Amtrak at various times, including January 1, 2012 through October 30, 2012. Amtrak also opted to shut down this MPE System in or about November 2017 through at least March 31, 2019, claiming that it was "impracticable" to continue operating, notwithstanding the ongoing detection of measurable light NAPL in monitoring and recovery wells.

**ANSWER**:     Amtrak admits that the MPE system has been shut down at various points

for maintenance and when it was no longer recovering sufficient amounts of liquid phase

hydrocarbons to make operation of the system practicable. Amtrak denies the remaining

allegations in Paragraph 35.

36.     Amtrak also has failed to implement additional remedial measures that could further address residual petroleum contaminating the subsurface that may be allegedly "impracticable" to recover via a free product recovery system. In particular, upon information and belief, Amtrak has not attempted any program to inject specialized surfactants, enzymes,

and/or oxygen-release compounds, which are often used to remediate free product petroleum spills once a free product recovery system has ceased being effective.

**ANSWER**:    Amtrak denies the allegations in Paragraph 36.

37.    Upon information and belief, Amtrak did not consider the impact of the MPE System shutdowns on the CPG Facility, and failed and/or refused to undertake or even propose any investigation or remediation activities to assess or address impacts to the CPG Facility, whether during shutdowns of the MPE System or otherwise.

**ANSWER**:    Amtrak denies the allegations in Paragraph 37.

38.    In or about July 2018, Amtrak entered into a modification of its Consent Order with the State of Illinois, extending its deadline to complete all remedial activities required by the remedial action plan in place at the Amtrak Facility to January 30, 2019.

**ANSWER**:    Amtrak admits the allegations in Paragraph 38.

39.    In or about January 2019, Amtrak entered into a second modification of its Consent Order with the State of Illinois, in which Amtrak agreed to continue to implement the remedial measures required by the remedial action plan and to submit completion reports for approval by Illinois EPA, and in which provisions were made for Amtrak to request termination of the Consent Order one year after completion of all actions required by it.

**ANSWER**:    Amtrak admits the allegations in Paragraph 39.

40.    Remedial action completion reports submitted by Amtrak were approved by Illinois EPA on April 19, 2019. Just over one year later, on April 21, 2020, Amtrak submitted a request to the State of Illinois for the Consent Order to be terminated, representing that it "has done extensive remediation at the [Amtrak Lumber Street site] for over a decade," "has completed all actions required by the Consent Order," and "has been in continuous compliance with the terms of the Consent Order for the twelve months preceding the request."

**ANSWER**:    Amtrak admits the allegations in Paragraph 40.

41.    On May 13, 2020, the State of Illinois agreed to Amtrak's request to terminate the Consent Order, and on May 21, 2020, Amtrak and the State of Illinois filed a Joint Notice of Termination of Consent Order with the District Court.

**ANSWER**:    Amtrak admits the allegations in Paragraph 41.

42.    Notwithstanding Illinois EPA's approval of Amtrak's remedial action completion reports as to onsite work at the Amtrak Facility, and notwithstanding the termination of Amtrak's Consent Order, the CPG Facility is and continues to be impacted by releases of hazardous substances at and from the Amtrak Facility.

**ANSWER**:    Amtrak denies the allegations in Paragraph 42.

43.     Nothing in the Consent Order entered into between Amtrak and the State of Illinois, or any modifications thereto and/or termination thereof by those parties, in any way protects or insulates Amtrak from responsibility for addressing these offsite impacts contaminating the CPG Facility.

**ANSWER**:     The allegations contained in Paragraph 43 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same.

### Amtrak's January 2019 Diesel Fuel Spill Incident

44.     At approximately 2:00 a.m. on January 6, 2019, an Amtrak mobile tanker truck was being filled with diesel fuel from a 450,000-gallon above-ground diesel fuel storage tank located on the Amtrak Facility. The truck driver failed to disconnect the fuel-loading hose from the truck before leaving the fuel loading area. As the tanker truck departed the loading area, the still-attached hose damaged the truck and caused the release of approximately 2,800 gallons of diesel fuel from the truck.

**ANSWER**:     Amtrak admits the allegations in Paragraph 44.

45.     Diesel fuel flowed from the loading area onto and along Lumber Street, and continued to spill from the truck as the driver stopped and parked the truck at the southwest corner of Continental Paper's building at the CPG Facility. From there, diesel fuel continued to spill into the parking lot at the CPG Facility and flowed eastward toward the Chicago River.

**ANSWER**:     Amtrak admits the allegations in Paragraph 45.

46.     While Amtrak undertook certain limited response actions at the CPG Facility to attempt to address the spill, according to reports prepared by Amtrak's environmental consultants, approximately 2,800 gallons of diesel fuel were released, but only 900 gallons were recovered --leaving 1,900 gallons of diesel fuel released but unaddressed.

**ANSWER**:     Amtrak denies the allegations in Paragraph 46.

47.     The CPG Facility is owned by Continental Paper and includes a building that formerly housed Continental Paper's U.S. headquarters and a warehouse. No manufacturing, fabrication, processing or other industrial operations of any kind were or are conducted at the CPG Facility. The CPG Facility is situated immediately adjacent to, and bounded on three sides by, the Amtrak Facility, with the South Branch of the Chicago River along the eastern side.

**ANSWER**:     Amtrak admits that the CPG Facility is situated immediately adjacent to, and bounded on three sides by, the Amtrak Facility, with the South Branch of the Chicago River along the eastern side. Amtrak is without sufficient knowledge or information regarding the remaining allegations of Paragraph 47, and therefore denies same.

48.     Amtrak's ongoing releases of hazardous substances from the Amtrak Facility have contaminated soil, surface water and groundwater at the CPG Facility.

**ANSWER**:     Amtrak denies the allegations in Paragraph 48.

49.     In late 2018, Continental Paper retained an environmental consultant to conduct a Limited Phase II Environmental Site Assessment ("2018 Limited ESA") of the CPG Facility. Four (4) groundwater monitoring wells were installed and sampled and six (6) soil borings were completed and sampled on the CPG Facility. The wells were also checked for the presence of petroleum free product at approximately one and two weeks after installation. The groundwater and soil samples were analyzed for volatile organic compounds ("VOCs"), PAHs and total petroleum hydrocarbon ("TPH") concentrations.

**ANSWER**:     Amtrak is without sufficient knowledge or information regarding the

allegations of Paragraph 49, and therefore denies same.

50.     Sampling results in connection with the 2018 Limited ESA at the CPG Facility were memorialized in a December 11, 2018 Limited ESA Report which stated, among other things, that (a) "Petroleum odors were noted in soils below about 2.5 ft.;" (b) "oil globules were in the soils;" (c) certain "saturated soils . . . had an iridescent sheen typical of heavy petroleum contamination;" (d) "[t]he groundwater sample for [monitoring well 2] . . . indicated an oily sheen on the water;" and (e) soil exceedances for naphthalene and TPH were observed at levels appearing to exceed applicable standards. Thus, the Limited ESA established the existence of contaminants on the CPG Facility consistent with impacts from releases of contamination at the Amtrak Facility.

**ANSWER**:     Amtrak is without sufficient knowledge or information regarding the

allegations of Paragraph 50, and therefore denies same.

51.     Moreover, after the January 2019 diesel fuel spill at the Amtrak Facility -- and after Amtrak purportedly took action to address the effects of the spill on the CPG Facility -- free petroleum product was detected in, and collected from, a monitoring well on the CPG Facility.

**ANSWER**:     Amtrak is without sufficient knowledge or information regarding the

allegations of Paragraph 51, and therefore denies same.

52.     Further, analyses performed on behalf of Continental Paper in February 2020 of one solid sample and one aqueous phase liquid sample collected from a monitoring well on the CPG Facility likewise indicated that these samples have the characteristics of relatively unweathered "middle distillate" or diesel fuel. Additional analyses performed at this time also confirmed the soil samples collected on behalf of Continental Paper in connection with the 2018 Limited ESA at the CPG Facility contain "middle distillate" or diesel fuel, with varying degrees of weathering.

**ANSWER**:     Amtrak is without sufficient knowledge or information regarding the

allegations of Paragraph 52, and therefore denies same.

53.     Further investigation, site characterization and environmental site assessment at
the CPG Facility are necessary to delineate the nature and extent of contamination of soils,
surface water and groundwater at the CPG Facility caused by releases at the Amtrak Facility.

**ANSWER**:     Amtrak denies the allegations in Paragraph 53.

54.     Despite repeated attempts and requests by Continental Paper, both in writing and
orally, to engage Amtrak in efforts to investigate and remediate the contamination at the CPG
Facility caused by Amtrak, to date, Amtrak has consistently refused and/or failed to undertake
any such efforts.

**ANSWER**:     Amtrak denies the allegations in Paragraph 54.

## COUNT ONE
## COST RECOVERY UNDER CERCLA SECTION 107(a)

55.     Continental Paper realleges and incorporates by reference the preceding
paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:     Amtrak's answers to the allegations in paragraphs 1 through 54, above, are

incorporated as if fully stated here.

56.     Amtrak is a "person" within the meaning of Section 101(21) of CERCLA, 42
U.S.C. § 9601(21).

**ANSWER**:     The allegations contained in Paragraph 56 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same.

57.     "Hazardous substances" within the meaning of Section 101(14) of CERCLA, 42
U.S.C. § 9601(14), including naphthalene, were disposed, placed or otherwise came to be located
at the Amtrak Facility.

**ANSWER**:     The allegations contained in Paragraph 57 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak

denies the remaining allegations in Paragraph 57.

58.     The Amtrak Facility and surrounding area is a "facility" within the meaning of
section 101(9) of CERCLA, 42  U.S.C.§ 9601(9).

**ANSWER**: The allegations contained in Paragraph 58 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same.

59. Upon information and belief, Amtrak is a liable person pursuant to Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), in that it is a present owner and/or operator of the Amtrak Facility, and/or pursuant to § 9607(a)(3), in that it arranged for the disposal of hazardous substances at the Amtrak Facility.

**ANSWER**: The allegations contained in Paragraph 59 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same.

60. Amtrak has caused a "release" or "threatened release" of hazardous substances within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). Such releases have contaminated and/or threatened to contaminate the soils, surface water and groundwater at the CPG Facility.

**ANSWER**: The allegations contained in Paragraph 60 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 60.

61. The investigation and actions taken by Continental Paper to evaluate impacts from the Amtrak Facility constitute "response" actions within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25). As a result, Continental Paper has incurred necessary costs of response consistent with the National Contingency Plan ("NCP") which was promulgated under Section 105(a) of CERCLA, 42 U.S.C. § 9605(a), and is codified at 40 C.F.R. part 300, *et seq*.

**ANSWER**: The allegations contained in Paragraph 61 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 61.

62. Continental Paper has incurred and will continue to incur necessary response costs pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.SC. § 9607(a)(4)(B) and implementing regulations.

**ANSWER**: The allegations contained in Paragraph 62 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 62.

63.     Amtrak is liable to Continental Paper for Continental Paper's response costs pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), plus interest.

**ANSWER**:     The allegations contained in Paragraph 63 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 63.

WHEREFORE, Continental Paper requests that judgment be entered in its favor and against Amtrak for all response costs incurred and to be incurred by Continental Paper, that a declaratory judgment be entered against Amtrak on liability for response costs that will be binding on any subsequent action or actions to recover further response costs, and that this Court award Continental Paper its costs of suit, including costs of enforcement activities, attorneys' fees, interest, and such other and further relief as the Court shall deem just and proper.

**ANSWER:**     Amtrak denies that Continental Paper is entitled to any relief, including the relief set forth in the unnumbered WHEREFORE Paragraph.

## COUNT TWO
## CLAIM FOR CONTRIBUTION UNDER CERCLA SECTION 113(f)

64.     Continental Paper realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:     Amtrak's answers to the allegations in Paragraphs 1 through 64, above, are incorporated as if fully stated here.

65.     Amtrak is a liable person pursuant to Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), in that it is a present owner and/or operator of the Amtrak Facility.

**ANSWER**:     The allegations contained in Paragraph 65 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 65.

66.     Each release or threatened release of hazardous substances at the Amtrak Facility, as detailed above, has caused and will continue to cause Continental Paper to incur necessary response costs consistent with the NCP.

**ANSWER**:     Amtrak denies the allegations in Paragraph 66.

67.     Under CERCLA Section 113(f)(1), 42 U.S.C. §§ 9613(f)(1), Continental Paper is entitled to contribution from Amtrak for necessary responses costs incurred or to be incurred by Continental Paper consistent with the NCP. Continental Paper is also entitled to an allocation by this Court of the response costs, future response costs, and damages as between Continental Paper and Amtrak using such equitable factors as this Court determines are appropriate

**ANSWER**:     The allegations contained in Paragraph 67 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 67.

WHEREFORE, Continental Paper requests that judgment be entered in its favor and against Amtrak for all response costs incurred and to be incurred by Continental Paper, that a declaratory judgment be entered against Amtrak on liability for response costs that will be binding on any subsequent contribution action or actions to recover further response costs, and that this Court award Continental Paper its costs of suit, including costs of enforcement activities, attorneys' fees, interest, and such other and further relief as the Court shall deem just and proper.

**ANSWER:**     Amtrak denies that Continental Paper is entitled to any relief, including the relief set forth in the unnumbered WHEREFORE Paragraph.

## COUNT THREE
## DECLARATORY JUDGMENT PURSUANT TO CERCLA § 113(g)(2)

68.     Continental Paper realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:     Amtrak's answers to the allegations in Paragraphs 1 through 67, above, are incorporated as if fully stated here.

69.     There exists an actual controversy between Continental Paper and Amtrak as to their respective rights and duties concerning the investigation and remediation of the contamination at, in, under, and around the CPG Facility caused by Amtrak, and as to activities, operations, acts, and omissions of Amtrak at the Amtrak Facility causing such contamination.

**ANSWER**:     The allegations contained in Paragraph 69 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 69.

70.     Pursuant to CERCLA section 113(g)(1), 42 U.S.C. § 9613(g)(2), as well as the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Continental Paper is entitled to a declaratory judgment holding Amtrak liable for its equitable share of all response costs incurred and to be incurred by Continental Paper in connection with its response to releases and threatened releases at the CPG Facility.

**ANSWER**:     The allegations contained in Paragraph 70 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak

denies the remaining allegations in Paragraph 70.

WHEREFORE, Continental Paper respectfully requests that judgment be entered in its favor and against Amtrak: (a) ordering Amtrak to reimburse or pay, as applicable, Continental Paper for its equitable share, as determined by the Court, of response costs under 42 U.S.C. § 9613(f)(1) which Continental Paper has incurred or will incur in the future as a result of Amtrak's contamination of the CPG Facility; (B) entering a declaratory judgment that Amtrak shall be liability under 42 U.S.C. § 9613(f)(1) for its equitable share of response costs, as determined by this Court, which Continental Paper has incurred or will incur in the future in connection with the CPG Facility; awarding Continental Paper its attorneys' fees, court costs and related legal expenses and all other relief that this Court deems appropriate.

**ANSWER:**     Amtrak denies that Continental Paper is entitled to any relief, including

the relief set forth in the unnumbered WHEREFORE Paragraph.

## COUNT FOUR
## TRESPASS

71.     Continental Paper realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:     Amtrak's answers to the allegations in Paragraphs 1 through 70, above,

are incorporated as if fully stated here.

72.     Amtrak has caused and/or allowed, and continues to cause and/or allow, petroleum and hazardous substances to migrate from the Amtrak Facility onto and under the CPG Facility through its negligent or intentional conduct.

**ANSWER**:     Amtrak denies the allegations in Paragraph 72.

73.     Amtrak's unreasonable failure to control or contain petroleum and other hazardous substances within the confines of the Amtrak Facility substantially and unreasonably interferes with Continental Paper's (and/or any future owner's) reasonable possession, use and enjoyment of the CPG Facility, which is situated immediately adjacent to the Amtrak Facility.

**ANSWER**:    Amtrak denies the allegations in Paragraph 73.

74.    The physical entry of petroleum and hazardous substances migrating from the Amtrak Facility onto the CPG Facility and interfering with Continental Paper's possession, use, and enjoyment of the CPG Facility, is unlawful.

**ANSWER**:    The allegations contained in Paragraph 74 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same.

75.    As a result of the migration of petroleum and other hazardous substances from the Amtrak Facility onto and under the CPG Facility, the value of the CPG Facility has been substantially diminished in an amount to be determined at trial. Continental Paper has also incurred and will continue to incur substantial expense assessing conditions at and/or remediating the CPG Facility, and has suffered economic costs and loss of use and enjoyment of the CPG Facility, among other damages. Continental Paper's damages are in excess of $75,000, exclusive of interest and costs.

**ANSWER**:    The allegations contained in Paragraph 75 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 75.

76.    Despite repeated written and oral demands, Amtrak has failed and/or refused to investigate and/or remediate contamination at the CPG Facility that has migrated from the Amtrak Facility.

**ANSWER**:    Amtrak denies the allegations in Paragraph 76.

WHEREFORE, Continental Paper respectfully requests that judgment be entered in its favor and against Amtrak for: (a) all costs incurred and to be incurred by Continental Paper in investigating and remediating the CPG Facility; and (b) the diminution in value of the CPG Facility arising as a result of Amtrak's contamination thereof in an amount to be determined at trial, (c) punitive or exemplary damages based upon Amtrak's willful or outrageous conduct due to evil motive or a reckless indifference to the rights of others. Continental Paper also requests relief in the form of injunction ordering Amtrak to (a) abate the continued and future mitigation of petroleum and other hazardous substances from the Amtrak Facility onto and under the CPG Facility, and (b) investigate and remediate any contamination currently present at the CPG Facility, as well as such other and further relief as the Court deems appropriate.

**ANSWER:**    Amtrak denies that Continental Paper is entitled to any relief, including the relief set forth in the unnumbered WHEREFORE Paragraph.

## COUNT FIVE
## PRIVATE NUISANCE

77.     Continental Paper realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:     Amtrak's answers to the allegations in Paragraphs 1 through 76, above,

are incorporated as if fully stated here.

78.     Amtrak's unreasonable failure to control or contain petroleum and other hazardous substances within the confines of the Amtrak Facility substantially and unreasonably interferes with Continental Paper's (and/or any future owner's) reasonable possession, use and enjoyment of the CPG Facility, which is situated immediately adjacent to the Amtrak Facility.

**ANSWER**:     Amtrak denies the allegations in Paragraph 78.

79.     As a direct and proximate result of Amtrak's conduct, Continental Paper has incurred and will continue to incur substantial expense investigating and remediating the CPG Facility, and has suffered economic costs, loss of use and enjoyment of the CPG Facility, and substantial diminution in value of the CPG Facility, among other damages. Continental Paper's damages are in excess of $75,000, exclusive of interest and costs.

**ANSWER**:     The allegations contained in Paragraph 79 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak

denies the remaining allegations in Paragraph 79.

80.     Despite repeated written and oral demands, Amtrak has failed and/or refused to investigate and/or remediate contamination at the CPG Facility that has migrated from the Amtrak Facility.

**ANSWER**:     Amtrak denies the allegations in Paragraph 80.

WHEREFORE, Continental Paper respectfully requests that judgment be entered in its favor and against Amtrak for: (a) all costs incurred and to be incurred by Continental Paper in investigating and remediating the CPG Facility; and (b) the diminution in value of the CPG Facility arising as a result of Amtrak's contamination thereof in an amount to be determined at trial, (c) punitive or exemplary damages based upon Amtrak's willful or outrageous conduct due to evil motive or a reckless indifference to the rights of others. Continental Paper also requests relief in the form of injunction ordering Amtrak to (a) abate the continued and future mitigation of petroleum and other hazardous substances from the Amtrak Facility onto and under the CPG Facility, and (b) investigate and remediate any contamination currently present at the CPG Facility, as well as such other and further relief as the Court deems appropriate.

**ANSWER:**   Amtrak denies that Continental Paper is entitled to any relief, including

the relief set forth in the unnumbered WHEREFORE Paragraph.

## COUNT SIX
## NEGLIGENCE

81.    Continental Paper realleges and incorporates by reference the preceding
paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:    Amtrak's answers to the allegations in Paragraphs 1 through 80, above,

are incorporated as if fully stated here.

82.    Amtrak owes Continental Paper, as an adjacent landowner, a duty to exercise
ordinary care and diligence so that environmental contamination created and/or caused by
Amtrak and conditions at the Amtrak Facility do not invade Continental Paper's property. In
addition, Amtrak owes Continental Paper, as an adjacent landowner, a duty to exercise ordinary
care and diligence in connection with Amtrak's generation, handling, disposal and containment
of hazardous substances and/or petroleum and/or diesel fuel in connection with Amtrak's
operations at the Amtrak Facility. Amtrak also owes Continental Paper, as an adjacent
landowner, a duty to exercise ordinary care and diligence in connection with Amtrak's
assessment and remediation of environmental contamination at the Amtrak Facility so as to not
invade and further exacerbate conditions at the CPG Facility.

**ANSWER**:    The allegations contained in Paragraph 82 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak

denies the remaining allegations in Paragraph 82.

83.    Amtrak knew or should have known that Amtrak's operations conducted at
Amtrak Facility resulted in the disposal and release of petroleum and hazardous substances,
causing releases to the environment that present a serious risk of injury to persons or property,
including Continental Paper, the CPG Facility, the Amtrak Facility and surrounding areas.

**ANSWER**:    The allegations contained in Paragraph 83 constitute legal conclusions to

which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak

denies the remaining allegations in Paragraph 83.

84.    Amtrak knew or should have known that petroleum and hazardous substances
present at the Amtrak Facility had migrated and were continuing to invade and migrate on and
under the CPG Facility.

**ANSWER**: The allegations contained in Paragraph 84 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same.

85. Amtrak breached its duties of care owed to Continental Paper and others by failing to act properly and reasonably to contain petroleum and hazardous substances at the Amtrak Facility, to prevent the discharge of petroleum and hazardous substances from the Amtrak Facility onto and under the CPG Facility, and to promptly and appropriately remedy the problems Amtrak caused, including preventing the migration of contaminants onto and under the CPG Facility.

**ANSWER**: The allegations contained in Paragraph 85 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 85.

86. Amtrak is also vicariously liable pursuant to the doctrine of *respondeat superior* for the negligent actions of its employees or agents who caused the migration of known petroleum and hazardous substances onto the CPG facility.

**ANSWER**: The allegations contained in Paragraph 86 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 86.

87. As a direct and proximate result of the conduct of Amtrak and/or its employees and/or agents, Amtrak has caused Continental Paper to suffer damages, including economic loss, loss of the use and enjoyment of the CPG Facility, and substantial diminution in value of the CPG Facility.

**ANSWER**: The allegations contained in Paragraph 87 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 87.

88. In light of the risks and dangers that were known or should have been known by Amtrak to exist at the time, Amtrak's conduct in allowing releases of petroleum and other hazardous substances and, after the discovery of such contamination, Amtrak's failure to promptly and adequately investigate, remediate, and notify Continental Paper and/or the appropriate governmental authorities of the contamination, was without legal justification or excuse. Continental Paper's damages are in excess of $75,000, exclusive of interest and costs.

**ANSWER**:    The allegations contained in Paragraph 88 constitute legal conclusions to which no response is required, and Amtrak therefore neither admits nor denies same. Amtrak denies the remaining allegations in Paragraph 88.

89.    Despite repeated written and oral demands, Amtrak has refused to investigate and/or remediate the contamination present at the CPG Facility.

**ANSWER**:    Amtrak denies the allegations in Paragraph 89.

WHEREFORE, Continental Paper respectfully requests that judgment be entered in its favor and against Amtrak for: (a) all costs incurred and to be incurred by Continental Paper in investigating and remediating the CPG Facility; and (b) the diminution in value of the CPG Facility arising as a result of Amtrak's contamination thereof in an amount to be determined at trial, (c) punitive or exemplary damages based upon Amtrak's willful or outrageous conduct due to evil motive or a reckless indifference to the rights of others. Continental Paper also requests relief in the form of injunction ordering Amtrak to (a) abate the continued and future mitigation of petroleum and other hazardous substances from the Amtrak Facility onto and under the CPG Facility, and (b) investigate and remediate any contamination currently present at the CPG Facility, as well as such other and further relief as the Court deems appropriate.

**ANSWER:**    Amtrak denies that Continental Paper is entitled to any relief, including the relief set forth in the unnumbered WHEREFORE Paragraph.

## AFFIRMATIVE DEFENSES

Amtrak asserts the following affirmative defenses, reserving the right to supplement or amend these defenses as discovery proceeds.

## FIRST AFFIRMATIVE DEFENSE

Continental Paper's claims fail, in whole or in part, to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Continental Paper's claims are barred in whole or in part because it caused or contributed to its alleged injuries, if any, by, among other things, causing or allowing contamination at, on or to the CPG Facility.

## THIRD AFFIRMATIVE DEFENSE

Continental Paper's claims are barred in whole or in part because its alleged injuries, if any, were caused by an intervening or supervening cause over which Amtrak had no control.

## FOURTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred in whole or in part because it failed to take reasonable steps to mitigate its damages.

## FIFTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred in whole or in part by the statute of limitations and/or repose.

## SIXTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred in whole or in part by the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred, in whole or in part, by the doctrine of estoppel.

## EIGHTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred in whole or in part by the doctrine of unclean hands. Continental Paper is responsible, at least in part, for the alleged presence of hazardous substances on its property.

## NINTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred, in whole or in part, because none of the alleged acts or omissions of Amtrak proximately caused Continental Paper's alleged damages.

## TENTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred, in whole or in part, by the doctrine of waiver.

## ELEVENTH AFFIRMATIVE DEFENSE

Amtrak is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

## TWELTH AFFIRMATIVE DEFENSE

Continental Paper is barred from recovery to the extent that the percentage of fault attributable to its own acts and wrongful conduct exceeds the fault, if any, of Amtrak.

## THIRTEENTH AFFIRMATIVE DEFENSE

The release or threat of release of hazardous substances at the CPG Facility, if any, was caused solely by an act of God, an act of war, or an act or omission of third parties as set forth in 42 U.S.C. § 9607(b).

## FOURTEENTH AFFIRMATIVE DEFENSE

Continental Paper's claims are barred insofar as Continental Paper seek to recover costs, damages, and expenses that are not "necessary costs of response," and were not incurred "consistent with the National Contingency Plan" and conditions precedent as required by CERCLA, 42 U.S.C. §§ 9605, 9607(a)(4)(A)-(B) and 40 C.F.R. § 300, *et seq*.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Pursuant to CERCLA, 42 U.S.C. § 9613(f)(1), this Court is requested to consider such equitable factors as it deems appropriate in resolving Continental Paper's claims. Amtrak is informed and believes and thereon alleges that upon reviewing such equitable factors, this Court will determine that Amtrak bears no responsibility for any response costs.

**SIXTEENTH AFFIRMATIVE DEFENSE**

The damages suffered by Continental Paper, if any, proximately resulted from the negligence, breach of conduct, or other fault or misconduct of parties, persons, and/or entities other than Amtrak, and the liability of Amtrak, if any, must be limited in direct proportion to the percentage of fault actually attributable to Amtrak.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Amtrak reserves the right to amend its answer to raise additional affirmative defenses as they become available or apparent to it through discovery in this matter or otherwise.

WHEREFORE, on the basis of the answers, denials, and defenses stated herein, Amtrak respectfully requests that this Court dismiss Continental Paper's Complaint with prejudice and enter judgment in favor of Amtrak; award Amtrak costs expended in defending this litigation, including, but not limited to, court costs and attorneys' fees; and grant such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Amtrak demands a trial by jury on all issues so triable.

Dated:  December 13, 2021        Respectfully submitted,

Allison A. Torrence             NATIONAL RAILROAD PASSENGER
Matthew G. Lawson             CORPORATION
Jenner & Block LLP
353 N. Clark Street
Chicago, IL  60654-3456        By:  */s/ Allison Torrence*
Phone: (312) 923-8347           One of Its Attorneys
atorrence@jenner.com
mlawson@jenner.com

**CERTIFICATE OF SERVICE**

I, Allison Torrence, hereby certify that on December 13, 2021, I electronically filed the

foregoing Answer to Complaint via the Court's CM/ECF system, which will deliver electronic

notice of filing to all counsel of record.

<div style="margin-left: 40%;">

*/s/ Allison Torrence*

Allison Torrence
Jenner & Block LLP
353 N. Clark Street
Chicago, IL  60654-3456
Phone: (312) 923-8347
atorrence@jenner.com

</div>